FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 14, 2019

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SHADY ACRES HOMEOWNER'S ASSOCIATION, | NO: 1:18-CV-3016-RMP |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITHOUT PREJUDICE |
| v. | |
| KITTITAS COUNTY, a municipal corporation, | |
| Defendant. | |

BEFORE THE COURT is Defendant Kittitas County's Motion for Summary Judgment, ECF No. 15. The Court heard oral argument from the parties, at which Meredith Bruch, Scott Crain, and David Morales appeared on behalf of Plaintiff Shady Acres Homeowner's Association, and Mark Johnson appeared on behalf of Defendant Kittitas County.

///

///

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITHOUT PREJUDICE ~ 1

# UNDERLYING FACTS

The Shady Brook Mobile Home Park (colloquially known as "Shady Acres") in Ellensburg, Washington, offers affordable housing, with "rent well below the average rent" in Kittitas County ("the County"), where there is a recognized shortage of affordable rental housing. ECF Nos. 36 at 6; 32-2 at 5; 53 at 5. Shady Acres has approximately 61 spaces for mobile homes. ECF No. 37 at 7. In spring 2016, approximately 57 mobile home spaces contained homes, of which 35 were occupied. ECF No. 37 at 7. Shady Acres is located adjacent to the Kittitas Valley Event Center and Fairgrounds ("Event Center"), owned by the County and host to the annual Kittitas County Fair, the Ellensburg Rodeo, and other events. ECF No. 34.

## A. Pre-Purchase of Property

Since at least 1997, and possibly earlier, the County had included the acquisition and repurposing of Shady Acres as an aspect of the County's "Master Plan" for the expansion of the Event Center. The Master Plan is the primary planning and policy document that guides the management and operation of the Event Center. ECF No. 33 at 7. On March 1, 2016, the County adopted the "2016 Kittitas Valley Event Center Master Plan" ("2016 Master Plan"), which incorporated the acquisition of Shady Acres as part of the plan and stated further: "The County has made an offer on [Shady Acres] and is currently conducting due diligence on the condition of the site and the assistance that would be necessary and appropriate to

relocate the low-income tenants." ECF No. 34 at 16; *see also* ECF Nos. 33-1 at 17; 34-1 at 2−3.

In the process of adopting the 2016 Master Plan, the County Commissioners invited all registered County voters to complete a survey, the respondents to which ranked the acquisition of the property occupied by Shady Acres as the "highest priority, out of all of the projects . . . in the Master Plan." ECF No. 33-1 at 26. The survey results were reported in the 2016 Master Plan, with the highest priority project restated as "Mobile Home Park – acquire the mobile home park to resolve code and safety issues; facilitate better low cost housing options for occupants; and restore and adequately buffer Wilson Creek." ECF Nos. 34 at 43; 34 at 39.

In approximately mid-April 2016, local news sources began reporting that the County was purchasing Shady Acres and closing the mobile park. ECF Nos. 16 at 13; 33-2 at 2; 37 at 2.

In response, in a letter dated May 2, 2016, addressed to all residents of Shady Acres, the County Board of Commissioners contended:

> We are writing to you today to assure you that nothing will be happening to your homes immediately. It is not accurate that Shady Acres will be closing in approximately a year from now. No decision about when Shady Acres will close has been made. While it is true that we are planning to close Shady Acres, you will be given at least 12 months' [sic] notice before it happens.

ECF No. 35-2 at 2 (emphasis in original). Additional relevant excerpts from the letter follow:

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITHOUT PREJUDICE ~ 3

- The County and the owner of Shady Acres are working to finalize the purchase and sale of the property. This could take anywhere from a few weeks to several months.
- Once the sale is finalized, you will be contacted by a property management company. You will pay rent to the property management company from that point on.
- In order to get information about what Shady Acres residents need, the County has hired a company called CC Consulting. CC Consulting will contact you directly in the future. They will ask questions to get information about what you will need during this process. The more information you provide, the better we can assist residents.
- The County will have several public meetings once the sale of Shady Acres is final. At the meetings, information collected by CC Consulting will be shared. The meetings will include discussion on next steps for eventually closing the park. You will be notified of the time and location of each meeting.

*Id.* at 2−3. The County also sent a Spanish translation of the letter. *See* ECF No. 35-3 at 2.

On May 3, 2016, the County issued a press release summarizing the content and purpose of the letter sent to Shady Acres residents the previous day. ECF No. 35-3 at 2−3. The press release further stated that the County had entered into a purchase and sale agreement with the owners of Shady Acres and that the "latest version of the [Event Center] Master Plan" names the property as a potential property "to be redeveloped into an RV park to service the needs of the Event Center for overnight parking and camping throughout the year." *Id.* at 3.

Around the time of the letter and press release, in approximately late April 2016, residents of Shady Acres formed the Shady Acres Mobile Homeowners

Association ("SAHA"), a nonprofit with dues-paying members who are residents of Shady Acres, whether as renters or homeowners. ECF No. 37 at 2. The objective of SAHA, as stated in its bylaws, is to "ensure the integrity of the community through the conservation of affordable housing" and to "foster[] the development of a community in which residents of all ages are cared for and supported . . . by working together to identify common goals through a transparent, inclusive process that promotes and encourages community participation at all levels." ECF Nos. 37 at 2–3; 37-1 at 2.

After entering a purchase and sale agreement for the Shady Acres property, the County hired a consulting firm, C.C. Consulting, to report back to the County on the issue of the needs of the Shady Acres residents after the County's potential acquisition of the property. ECF No. 33-1 at 42–43. The County's contract with the consulting firm defined the scope of the firm's work as "mobile home park closure planning and resident relocation assistance[.]" ECF No. 33-1 at 43 (capitalization modified from original). The pair of consultants who operate C.C. Consulting met with Shady Acres residents on approximately July 14, 2016, to present potential resources available to residents and solicit input regarding the residents' needs and concerns. ECF Nos. 35-6 and 35-7.

On approximately August 18, 2016, the County Commissioners held a public hearing for consideration of financing methods for the County's purchase of Shady

Acres.  ECF No. 33-1 at 15−16.  Members of SAHA and its board spoke against the purchase and closure of Shady Acres.  ECF No. 37 at 4.

### B. Purchase and Post-Purchase of Property

The County finalized its purchase of Shady Acres on September 12, 2016. ECF No. 17 at 2.  At the end of the month, C.C. Consulting submitted a report to the County regarding the consulting firm's "early research and planning phase" of their contract, outlining the firm's findings regarding alternative housing opportunities and possible resources available to Shady Acres residents, in both owner-occupied and tenant-occupied units, upon notice of closure of Shady Acres.  ECF Nos. 35-8 and 35-6.  C.C. Consulting informed the County at the time that it submitted its report that the consultants had decided to cancel the remainder of the contract with the County because of the consultants' perception that "the residents weren't willing to work with [them]."  ECF No. 35-6 at 21.  The consultants' perception that the Shady Acres residents were unwilling to accept assistance from C.C. Consulting was based on the July 14, 2016 meeting.  ECF No. 35-6 at 21−22.

Upon purchase of Shady Acres, the County hired a rental management company, Accolade Property Management Group ("Accolade"), to manage the property.  ECF No. 35-9 at 5.  As reported by Accolade's Fed. R. Civ. P. Rule 30(b)(6) designee, the County instructed Accolade not to list any vacant lots at Shady Acres to lease.  ECF No. 35-9 at 7−8; *see also* ECF No. 33-1 at 35.   Since

September 2016, the County has removed from Shady Acres the 22 mobile homes that were vacant at the time that the County purchased the property. ECF No. 35-9 at 12; *see also* ECF No. 51 at 8. Accolade's designee recalled that vandalism had been an issue at the vacant home sites. ECF No. 35-9 at 12. County Commissioner Obie O'Brien also maintained that the vacant structures had been determined to be uninhabitable, and there were "situations where the vacant trailers were attracting vermin, rodents" as well as a trailer that was being used by a nonresident for raising pigs and growing marijuana. ECF No. 53 at 6−7.

In December 2016, the County offered to enter into five-year leases with current residents. Most Shady Acres residents elected to sign the five-year leases, with a few residents deciding against extending their lease terms. ECF Nos. 17 at 2; 33 at 32. Under the leases, mobile home owners will be responsible for moving their own mobile homes at the expiration or termination of the lease. ECF No. 35-9 at 16.

### C. Near Future Plans and Present and Future Ramifications of Potential Closure

In a deposition on July 25, 2018, County Commissioner Paul Jewell, who had left office on June 30, 2018, emphasized that the County did not purchase the property as a "revenue-producing property." ECF No. 33-1 at 7, 9. Rather, the "idea behind the purchase was for the eventual expansion of the event center." *Id.* at

7. Commissioner O'Brien posited in his July 24, 2018 deposition that "at some point if the park empties out . . . and there's virtually nobody living there anymore then we'll go ahead and convert it." ECF No. 33 at 24. Commissioner O'Brien confirmed elsewhere, however, that "[e]ventually [the Shady Acres property] is going to be tasked to be used for an event center." ECF No. 33 at 14.

A Shady Acres resident asserts that neither Accolade nor the County have made necessary repairs to the laundromat located on the Shady Acres property, as the previous owners used to do. ECF No. 41 at 2. As a result, Shady Acres residents have resorted to using local laundromats, located around one mile away. *Id.* In addition, Accolade and the County have ceased the prior owners' practice of cutting the grass around the outbuildings and rentals and in the field behind the laundromat building within Shady Acres. *Id.* The same resident reports that Accolade staff sent a notice to the resident conveying an expectation that residents "mow our yards weekly, keep the lawn watered and in a healthy shade of green, and . . . keep the flower/rock beds weeded." ECF No. 41 at 2.

A proposed expert witness for Plaintiff opines that closing Shady Acres would "have a disproportionate and significant effect on the ability of Latino families to find and obtain housing" in Kittitas County. ECF No. 36. The expert witness reasons:

> The loss of 22 mobile home spaces, at a rent affordable to people with income below 60 percent of [Area Median Income], disproportionally

affects Latinos in Kittitas County because they are more likely than whites to need housing at this level of affordability.

. . .

Further, Latinos are disproportionately affected by the loss of the 22 affordable lots for mobile homes. Based on 2010 Census data 72.3% of Shady Brook Mobile Home Park are Latino. Latino residents of the Shady Brook Mobile Home Park comprise 2.8% of the Latino population in Kittitas County and 5.2% of the Latino population in Ellensburg. White residents of the Shady Brook Mobile Home Park comprise 0.1% of the White residents in Kittitas County and .22% of the white residents in Ellensburg. Latino residents of Kittitas County are 28 times more likely to be affected by the closing of the Shady Brook Mobile Home Park than White residents of Ellensburg.

ECF No. 36 at 6−7.

At Plaintiff's request, a general contractor and mobile home dealer evaluated the homes for their fair market value and the cost to move them to a new location. ECF No. 38. He estimated that a Shady Acres resident would incur $12,200 for all of the costs involved in relocating a single-wide mobile home to a new location and a total of $16,800 to relocate a double-wide mobile home. ECF No. 38 at 3−4. The cost of moving many of the mobile homes at Shady Acres exceeds the fair market value of the homes, often by more than double. *Id.* at 4. According to Plaintiff's expert's evaluation, only two of the privately-owned mobile homes at Shady Acres would retain any value if moved. *Id.* at 5.

The County Assessor assessed the value of properties within Shady Acres and in the surrounding area in 2017, as part of a cyclical valuation process. ECF No. 54 at 2. Many, but not all, of the owner-occupied mobile homes at Shady Acres that the

County Assessor had assessed at between $800 and $3000 in the previous assessment cycle were assessed at $450 in 2017. *See* ECF Nos. 35-11 at 2−3; 40 at 3; 41 at 3; 43 at 3.

The County Assessor declared, "If a mobile home or other property has little market value, the Assessor typically assigns a value of $450, which signifies that the County will not seek to collect property taxes from the owner." The County Assessor continued: "The County's purchase of the Shady Acres property from [the prior owner] in 2016 was not a fact that was considered by the Assessor's Office in the 2017 revaluations. Other mobile homes in the area received similar reductions." ECF No. 54 at 2.

SAHA submits statements from members who own their mobile homes asserting that they are not performing improvements or repairs on their homes because they are convinced that they will lose their entire investment in their homes once the County closes Shady Acres. *See* ECF Nos. 40 at 2; 41 at 2; 43 at 2; 45 at 2. As emphasized by one SAHA member, she cannot afford to spend money on her home "in a way that will not maintain [her] investment in [her] home." ECF No. 39 at 2. Several Shady Acres residents unsuccessfully have attempted to sell their homes since 2016 and maintain that prior to 2016 there was greater demand for housing in Shady Acres. *See* ECF Nos. 39 at 3; 43 at 3; 46 at 3. As a result of their perceived inability to recoup repair costs to their homes, some Shady Acres residents

are not repairing their homes and are experiencing compromised living conditions and increased risk of harm from living in unrepaired housing. *See* ECF Nos. 41 at 3; 45 at 2. The Shady Acres residents from whom Plaintiff gathered declarations in response to Defendant's summary judgment motion report a desire to continue living in Shady Acres beyond the 5-year lease term with the County. *See* ECF Nos. 39, 40, 41, 43, 44, 45, and 46.

As for SAHA, as stated by its Secretary in September 2018, the association "would like to spend more time on community building activities . . . , but opposing the closure of the park and the loss of the affordable housing the park provides has been consuming most of our time." ECF No. 37 at 6. Furthermore, SAHA's

> . . . advocacy prior to filing this litigation and this litigation have consumed the Association's limited resources. This includes [SAHA members'] dues money that has been spent on flyers and other miscellaneous expenses, and about a dozen board meetings and three membership meetings concerning the topic of the purchase of the park by the County and the adopted plan by the County to close the park and use it for another purpose.

ECF No. 37 at 5.

## DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's role at summary judgment "is to

isolate and dispose of factually unsupported claims" to prevent those claims "from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Once the moving party has met its burden, the party opposing summary judgment must specify facts that establish a material dispute for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also* LCivR 56(c)(1)(B).

In determining a summary judgment motion, the court views the evidence, and the inferences that may be drawn from the evidence, in the light most favorable to the nonmoving party.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  A district court's function at summary judgment is not to make credibility determinations or weigh conflicting evidence regarding a disputed material fact.  *See id.* at 630.

**B. Procedural Issue**

Plaintiff points out in response to Defendant's summary judgment motion that Defendant failed to file a separate "Statement of Material Facts Not in Dispute," as required by LCivR 56(c), and instead recounted the factual context for their motion in a "Background" section without citations "to any authority for those contentions." ECF No. 30 at 3.  Therefore, Plaintiff argues that the Court should deny the motion based on Defendant's failure to meet its burden under Fed. R. Civ. P. Rule 56 and

former Local Rule 56.1[1], or, alternatively, should "disregard all conclusory statements and unsubstantiated inferences in its motion." Defendant offers no response to Plaintiff's argument.

The Court finds that the lack of a separate statement of material facts from Defendant does not compel denial of the motion. Rather, the Court shall assume the truth of the evidence offered by Plaintiff in support of the facts that Plaintiff alleges in its statement of facts, consistent with the Court's overall role at summary judgment. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630−31. If the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the Court must assume the truth of the evidence submitted by the nonmoving party. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). In this case, both by default and in light of Defendant's failure to submit a separate statement of facts in support of the motion for summary judgment, the Court assumes the truth of Plaintiff's statement of facts, as Plaintiff is the nonmoving party.

### C. Applicable Law

Plaintiff argues that the County's actions and policy, as expressed in the 2016 Event Center Master Plan, violate the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3604, and the Washington Law Against Discrimination ("WLAD"), Wash. Rev.

---

[1] Former Local Rule 56.1 became Local Civil Rule 56 on the same day that Plaintiff filed its response.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITHOUT PREJUDICE ~ 13

Code ch. 49.60, and warrant an injunction against closing or otherwise making

housing unavailable at Shady Acres and requiring Defendant "to implement a less

discriminatory alternative which will maintain affordable housing for all of the

County's residents, including its Latino/Hispanic residents, and the residents of

Shady Acres." ECF No. 1 at 4.

Plaintiff alleges violations of the FHA based on disparate treatment and

disparate impact on Latino and Hispanic individuals who reside at Shady Acres and

who reside in Ellensburg and the County generally. ECF No. 1 at 2, 27. The FHA

prohibits discrimination "against any person in the terms, conditions, or privileges of

sale or rental of a dwelling, or in the provision of services in connection therewith,

because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. §

3604(b). Discrimination may be established upon either disparate treatment or

disparate impact. *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir.

2008); *Gamble v. City of Escondido*, 104 F.3d 300, 304−05 (9th Cir. 1997).

To prevail on a disparate treatment claim, Plaintiff may utilize either of two

methodologies. First, a plaintiff may establish a prima facie case, as the first step in

the *McDonnell-Douglas*[2] burden shifting framework which has been imported from

the Title VII employment discrimination arena, by providing sufficient evidence to

support that "(1) plaintiff's rights are protected under the FHA; and (2) as a result of

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITHOUT
PREJUDICE ~ 14

the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury." *Harris v. Itzhaki*, 183 F.3d 1042, 1051 (9th Cir. 1991). The burden then shifts to defendant to articulate "a legitimate, nondiscriminatory reason for its action." *Gamble*, 104 F.3d at 305. Next, the burden returns to the plaintiff to prove by a preponderance that the defendant's asserted reason is a pretext for discrimination. *Id*. Alternatively, in lieu of the *McDonnell-Douglas* framework, a plaintiff may instead "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" defendant's challenged action(s). *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122−23 (9th Cir. 2004).

To prevail on a disparate impact claim, Plaintiff must demonstrate a prima facie case that Defendant's purchase of the Shady Acres property and plans to repurpose the mobile home park for the benefit of the Event Center has a "'disproportionately adverse effect on minorities' and [is] otherwise unjustified by a legitimate rationale." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.* ("*Inclusive Communities*"), 135 S. Ct. 2507, 2513 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). A plaintiff may show disproportionate adverse effect by showing a statistical disparity and a policy or policies that caused the disparity. *Inclusive Communities*, 135 S. Ct. at 2523. To "protect defendants from being held liable for racial disparities they did not create," the causal link

between the policy and the disparity must be "robust." *Id.* "A plaintiff who fails to . . . demonstrat[e] a causal connection cannot make out a prima facie case of disparate impact." *Id.*

**D. Analysis**

<u>Standing</u>

Claims under the FHA are subject to a "very liberal standing requirement." *Harris v. Itzhaki*, 183 F.3d 1043, 1049 (9th Cir. 1999). Plaintiffs pursuing relief under the act need only allege the "Article III minima of injury in fact[.]" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). The "'irreducible constitutional minimum' of standing consists of three elements.'" *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* The plaintiff bears the burden of establishing standing. *Id.*

For an organizational plaintiff, standing requires showing that defendant's allegedly unlawful activities concretely and demonstrably injured the "organization's activities," that is, caused "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 379, 379 (1982). *Havens* involved a housing rights organization whose mission was

to provide counseling and referral services to home-seekers. The plaintiff

organization alleged that defendants' discriminatory acts, in the form of racial

steering practices,[3] had caused the organization to devote resources to investigating

reports of discrimination. *Id.* The Supreme Court found that the organization had

standing to sue under the FHA because the "steering practices have perceptibly

impaired [the organization's] ability to provide counseling and referral services for

low- and moderate-income home-seekers." *Id.*

Applying *Havens*, the Ninth Circuit determined that a housing rights

organization has standing when it demonstrates: (1) frustration of its organizational

mission; and (2) diversion of its resources to combat the discriminatory practice in

question. *Fair Housing of Marin v. Combs*, 285 F. 3d 899, 905 (9th Cir.), cert.

denied, 537 U.S. 1018 (2002).

SAHA sets forth a compelling case for sufficient injury to the organization;

the Court accepts for purposes of the present motion that SAHA has sufficiently

stated a basis, in theory, for the organization to have standing on its own behalf,

based on frustration of its mission and diversion of resources. However, the

---

[3] The Supreme Court defined racial steering as the "practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups." *Havens*, 455 U.S. at 367 n. 1 (internal citation omitted).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITHOUT PREJUDICE ~ 17

challenged conduct of Defendant is closing the mobile home park. Even if SAHA is situated alongside individual residents to experience harm from the closing of Shady Acres, the record reflects that the alleged injury, closing the mobile park, has not yet occurred in a concrete form sufficient for SAHA to assert claims under the FHA. An injury is sufficient for standing only when it is both concrete and particularized and "actual or imminent, not 'conjectural' or hypothetical.'" *Lujan*, 504 U.S. at 560 (internal quotation omitted). The disproportionate displacement of Latino and Hispanic residents is conjectural and undisputedly has not yet occurred.

Having determined that Plaintiff does not have standing under the FHA until Plaintiff can satisfy that there is an injury in fact as a consequence of Defendant's challenged action, the Court proceeds to analyze the closely-intertwined issue of ripeness.

<u>Justiciability and Ripeness</u>

Defendant argues that "nothing that has occurred to date would suggest that the claims asserted by SAHA in its Complaint are presently justiciable or ripe." ECF No. 15 at 6. Defendant asserts that the closure of Shady Acres is not certain and that a final decision regarding the use of the property has not been made. *Id.* at 2.

"While standing is primarily concerned with who is a proper party to litigate a particular matter, ripeness addresses when litigation may occur." *Lee v. Oregon*,

107 F.3d 1382, 1387 (9th Cir. 1997). "[I]n many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581 (1985) (internal quotations omitted). If a claim is not ripe for adjudication, the Court lacks subject matter jurisdiction, and the claim must be dismissed. *Southern Pacific Transportation Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990), *cert. denied*, 502 U.S. 943 (1991); *see also* Fed. R. Civ. P. 12(h)(3) (requiring court to dismiss an action if, at any point in the proceedings, the court determines it lacks subject matter jurisdiction).

"Determining whether [an action] is ripe for judicial review requires [the Court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 808 (2003).

Plaintiff contends that it has demonstrated current injury, including diversion of the organization's resources, that is not contingent on future closure of the park. Plaintiff also argues that the closure of the park is sufficiently certain and imminent, as evidenced by the negative effects that the Shady Acres community already is

experiencing under the County's ownership. Specifically, Plaintiff asserts injuries in the form of diversion of resources by SAHA, reduction of assessed value of the Shady Acres residents' mobile homes, and compromised living conditions for Shady Acres residents due to attrition from the park, decisions not to repair or groom areas of the park by the County, and decisions by residents not to repair homes based on a perception of limited future value, or some combination thereof. Nonetheless, viewing the facts in the light most favorable to Plaintiff, the Court cannot determine that the relationship between the current injuries that Plaintiff asserts and the conduct that Plaintiff challenges, a possible closure of the park in the future, is sufficiently tangible to proceed.

The causes of action that Plaintiff raises would not result in judicial relief that redresses the injuries that Plaintiff sets forth in response to the instant motion. *See Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir.1982) ("It is a prerequisite of justiciability that judicial relief will prevent or redress the claimed injury, or that there is a significant likelihood of such redress.").

Plaintiff's complaint alleges that closing a mobile home park and displacing its residents will disparately impact Latinos and Hispanics or is a form of disparate treatment of that population. ECF No. 1 at 1. To support standing and ripeness, Plaintiff argues that there is already injury that SAHA has suffered in the form of lost dues from two former SAHA members who moved out of Shady Acres, and

from the loss of potential new membership dues when the County removed the 22

vacant homes from the park. However, the injury, in addition to being speculative

and unsubstantiated by the record, would not be redressable by the claims for relief.

Likewise, the injunctive relief sought by Plaintiff would not redress the alleged

decrease in home values, the reduced sense of community within Shady Acres, and

the changes to maintenance of the landscaping and community facilities under

County ownership. There is nothing in the record to support that anyone who wants

or needs housing in the park has been declined. Plaintiff explained at the hearing

that Plaintiff had only anecdotal evidence that someone unsuccessfully tried to rent

space at Shady Acres since the County became owner. There also is no evidence

that anyone currently living in the park has been denied the opportunity to stay.

Therefore, Plaintiff did not submit evidence supporting any injury in fact relating to

actualized impact on the Latino and Hispanic population.

Although the Court is sympathetic to the hardship to Plaintiff presented by the

uncertainty of the timing and manner of the potential closure of the park, the

circumstances surrounding that potential closure are insufficiently developed for

judicial review. In essence, until the County closes the park, or gives notice of

closure of the park, there cannot be disparate impact or treatment. Even if potential

injury in one form or another is likely because of a possibility that the County

eventually will close the park, that injury is speculative until it actually occurs.

Plaintiff's claims are not ripe for adjudication at this time. Therefore, the Court lacks jurisdiction and must dismiss Plaintiff's complaint without prejudice. *See Southern Pacific Transportation Co*, 922 F.2d at 502; Fed. R. Civ. P. 12(h)(3); *see also Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir.), cert. denied sub nom. *Missouri ex rel. Hawley v. Becerra*, 137 S. Ct. 2188, 198 L. Ed. 2d 255 (2017) ("In general, dismissal for lack of subject matter jurisdiction is without prejudice.").

Absent subject matter jurisdiction over the federal claims, the Court has no discretion to exercise supplemental jurisdiction over Plaintiff's WLAD claim, and dismisses that claim without prejudice, as well. *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1108 (9th Cir. 2017) (citing *Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001)).

Finally, although Defendant raises the justiciability issues of lack of standing and unripeness through a summary judgment motion, the correct disposition in circumstances in which a claim is unripe or a party lacks standing is dismissal, not summary judgment. *See S. Pac. Transp. Co. v. City of L.A.*, 922 F.2d 498, 508 (9th Cir. 1990) (citing *Lai v. City and Cty. of Honolulu*, 841 F.2d 301, 303 (9th Cir.), *cert. denied*, 488 U.S. 994 (1988)); *see also Lodestar Co. v. County of Mono*, No. 90-15915, 1991 U.S. App. LEXIS 24452 at *6−7, 1991 WL 203782, at *2 (9th Cir. Oct. 9, 1991) ("Based on our review of the summary judgment pleadings, we find appellants had adequate notice of the ripeness issue. Furthermore, it was proper for

the district court to construe the summary judgment motion on ripeness grounds as a motion to dismiss for lack of subject matter jurisdiction.") (citation omitted).

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment, **ECF No. 15**, is **GRANTED IN PART** with respect to finding that the FHA claims asserted by Plaintiff are barred by the absence of standing and justiciability and the unripe nature of the claims. Defendant's motion is **DENIED IN PART** with respect to entry of summary judgment against Plaintiff.

2. Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**, without costs or fees for any party. As these rulings dispose of the case, the District Court Clerk shall enter judgment of dismissal without prejudice.

3. All upcoming hearings and deadlines in this matter are **vacated**, and all pending motions are **denied as moot**.

**IT IS SO ORDERED**. The District Court Clerk is directed to enter this Order, enter judgment of dismissal without prejudice as directed, provide copies to counsel, and **close the file**.

**DATED** February 14, 2019.

                        *s/ Rosanna Malouf Peterson*
                      ROSANNA MALOUF PETERSON
                        United States District Judge